IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PHILMAR DAIRY, LLC; ARCH
DIAMOND, LLC; MOONSTONE DAIRY, LLC;
and HENDRIKA DAIRY, LLC;

    Plaintiffs,

v.                                                      No. 18-cv-0530 SMV/KRS

ARMSTRONG FARMS and
RANDY ARMSTRONG,

    Defendants,

and

RANDY ARMSTRONG,

    Counterclaimant,

v.

PHILMAR DAIRY, LLC; ARCH
DIAMOND, LLC; MOONSTONE DAIRY, LLC;
and HENDRIKA DAIRY, LLC;

    Counter-defendants.

### MEMORANDUM OPINION AND ORDER DENYING
### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

THIS MATTER is before the Court on Plaintiffs' Motion for Partial Summary Judgment [Doc. 43], filed on December 5, 2018. Defendants responded on December 27, 2018. [Doc. 55]. Plaintiffs replied on January 10, 2019. [Doc. 60]. The parties consented to have the undersigned conduct dispositive proceedings in this matter. [Doc. 13]. The Court held oral argument on the Motion on January 14, 2019. [Doc. 62] (clerk's minutes). The Court has considered the briefing,

the oral argument, the relevant portions of the record, and the relevant law. Being otherwise fully advised in the premises, the Court will **DENY** Plaintiffs' Motion.

## I. BACKGROUND[1]

Plaintiffs are dairies located in Portales, New Mexico. [Doc. 1-1] at 13. Defendant Armstrong Farms, owned by Defendant Randy Armstrong, is a farm near Dell City, Texas, that orally agreed to sell Plaintiffs approximately 9,232 tons of hay for the 2017 growing season. [Doc. 43] at 4; [Doc. 43-1] at 1–2. Over eight months, Plaintiffs incrementally paid Defendants for the hay whenever Defendants presented them with invoices for it. [Doc. 43-1] at 1–2; [Doc. 43-3] at 1. Defendants then incrementally delivered it to Plaintiffs. *See* [Doc. 43-3] at 2–4. Plaintiffs paid $1,352,391.46 in total for the hay. [Doc. 43-1] at 1–2. Defendants stored the hay on open-air stack lots on their farm until delivery. [Doc. 55] at 4. Defendants claim that when Armstrong negotiated the contract with Plaintiffs' representative, Aaron Douma, Douma orally agreed that Plaintiffs, upon payment for the hay, would assume the risk of loss for it while Defendants stored it on their farm. [Doc. 55] at 6; [Doc. 55-2] at 2–3. Plaintiffs disagree. They argue that Douma neither discussed nor agreed to those terms. [Doc. 60] at 5; [Doc. 60-3] at 2.

From May 2017 through February 2018, Defendants delivered approximately 6,585 tons of hay to Plaintiffs. [Doc. 1-1] at 15. Defendants claim that on August 23 or 24, 2017, a fire on part of the farm destroyed some of the stored hay. [Doc. 43-1] at 7–8. Plaintiffs nevertheless continued to pay for hay, and Defendants continued to deliver it to them, after the fire. [Doc. 43-3] at 1–4. Defendants did not notify Plaintiffs of the fire until at least one week after the fire.

---

[1] As Plaintiffs move for summary judgment, these facts are taken in the light most favorable to the non-moving Defendants. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

2

[Doc. 43-1] at 7–8. Plaintiffs never received 2,647 tons of hay, a loss Defendants attribute to the fire. [Doc. 55] at 3. Defendants refused to refund the payment for the missing hay. [Doc. 1-1] at 16; [Doc. 55] at 4.

## II. PROCEDURAL HISTORY

Plaintiffs sued Defendants in New Mexico state court on April 26, 2018. [Doc. 1-1] at 1. Count II of the Complaint alleges that Defendants breached the oral contract by failing to deliver the remaining 2,647 tons of hay. *Id.* at 17. Defendants removed the action to this Court on June 7, 2018. [Doc. 1]. On December 5, 2018, Plaintiffs moved for partial summary judgment with respect to their breach-of-contract claim in Count II. [Doc. 43].

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court must deny summary judgment if a reasonable jury could find for the non-movants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When applying this standard, the court must construe the evidence in the light most favorable to the non-moving parties. *Tolan*, 572 U.S. at 657. The party moving for summary judgment has the initial burden of establishing that there is an absence of evidence supporting the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the movant meets this burden, the parties opposing summary judgment must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n.11 (10th Cir. 1992).

## IV. ANALYSIS

Plaintiffs claim they are entitled to summary judgment on two grounds. First, they argue that the risk of loss for the destroyed hay remained with Defendants until delivery. *Id.* at 7–8. Plaintiffs relatedly contend that, even if the parties shifted the risk of loss upon payment for the hay, they paid for the destroyed hay *after* the fire occurred, meaning that the risk of loss remained with Defendants. [Doc. 43] at 8. Second, Plaintiffs argue that, under Uniform Commercial Code ("UCC") § 2–613, the fire did not excuse Defendants' nonperformance of the contract. *Id.* at 9–11. Defendants counter that Plaintiffs orally agreed to assume the risk of loss for the destroyed hay upon payment. [Doc. 55] at 6–7. Additionally, Defendants argue that local trade usage established that Plaintiffs assumed the risk of loss while the hay was stored at Defendants' farm. *Id.* at 7–8. For the following reasons, the Court holds that a reasonable jury could find that the parties orally agreed to shift the risk of loss upon payment for the hay, making summary judgment improper.

A genuine issue of material fact exists over whether the parties orally agreed to modify the default rule that the risk of loss passes from a merchant seller to the buyer only upon receipt of the goods. Because this was a contract for the sale of goods, the UCC governs.[2] § 55-2-102. UCC § 2–509, as codified in N.M. Stat. Ann. § 55-2-509, allocates the risk of loss among parties in the absence of breach:

---

[2] The parties do not clearly state whether Texas or New Mexico law governs the contract; they mention both sources of law in their briefing. *See, e.g.*, [Doc. 43] at 6 & n.1; [Doc. 55] at 5. The difference is immaterial because both states have adopted the UCC, and the statutory language regarding risk of loss is identical. *See* N.M. Stat. Ann. § 55-2-509 (2006); Tex. Bus. & Com. Code Ann. § 2.509 (2005). Since Plaintiffs state that the contract is "governed by the provisions of the UCC, NMSA 1978, Sections 55-1-101 to 55-9-507," and Defendants do not expressly contest this statement, the Court will apply New Mexico law. [Doc. 43] at 6.

(3) In any case not within Subsection (1) or (2) of this section,[3] the risk of loss passes to the buyer on the buyer's receipt of the goods if the seller is a merchant; otherwise the risk passes to the buyer on tender of delivery.
(4) The provisions of this section are subject to contrary agreement of the parties and to the provisions of this article on sale on approval (Section 55-2-327 NMSA 1978) and on effect of breach on risk of loss (Section 55-2-510 NMSA 1978).

§ 55-2-509. Because the parties do not dispute that Plaintiffs never received 2,647 tons of hay, *see* [Doc. 55] at 3, and that Defendants are merchants, *see id.* at 5, the risk of loss remained with Defendants unless a "contrary agreement" shifted the risk of loss to the buyers before receipt of the hay. *See* § 55-2-509(4).[4]

Courts often hesitate to find this "contrary agreement," at least when interpreting written contracts. "A contract which shifts the risk of loss to the buyer before he receives the merchandise is so unusual that a seller who desires to achieve this result must clearly communicate his intent to the buyer." *Caudle v. Sherrard Motor Co.*, 525 S.W.2d 238, 240 (Tex. Civ. App. 1975);[5] *id.* ("If parties intend to shift the burden of the risk of loss from the seller to the buyer before delivery . . . then such must be done in clear and unequivocal language."); *see Galbraith v. Am. Motorhome Corp.*, 545 P.2d 561, 563 (Wash. Ct. App. 1976) ("The 'contrary agreement' of the parties must expressly shift the loss and such a shift will not readily be inferred."). Whether a written contract clearly shifts the risk of loss depends on its language. Ambiguous language cannot shift the risk of loss and the parties may not include the relevant language in the fine print. *Hayward v. Postma*,

---

[3] Subsections (1) and (2) do not apply in this case because (1) the contract did not require or authorize Defendants to ship the hay by carrier and (2) the contract did not establish a bailment. *See* § 55-2-509(1)–(2); [Doc. 55] at 5. This case therefore falls under § 55-2-509(3)–(4).

[4] Plaintiffs argue that Comment 3 to § 55-2-509, which states that "a merchant seller cannot transfer risk of loss and it remains upon him until actual receipt by the buyer," prohibits *any* shifting of the risk of loss. [Doc. 60] at 8–9. This argument is clearly without merit because § 55-2-509(4) states that "the provisions of this section [including § 55-2-509(3) and the comments] are subject to contrary agreement of the parties." § 55-2-509(4).

[5] New Mexico state courts have yet to interpret this section of the UCC; therefore, the Court looks to other jurisdictions for persuasive authority.

188 N.W.2d 31, 33 (Mich. Ct. App. 1971). The UCC also states, however, that a contrary agreement may exist without any express language; it "can also be found in the circumstances of the case, a trade usage or practice, or a course of dealing or performance." § 55-2-509 cmt. 5.

Here, however, we are dealing with an oral contract, and Plaintiffs cite no authority applying § 55-2-509(4) to oral contracts. Because the parties here dispute whether they agreed that Plaintiffs would bear the risk of loss before delivery, summary judgment on this issue is improper. Douma states in his affidavit, "I never had any discussion whatsoever with Randy Armstrong in which we discussed shifting the risk of loss . . . and certainly never agreed to shift the risk of loss." [Doc. 60-3] at 2. Armstrong, however, avers, "I told [Douma] that the dairies would assume the risk of loss—including shrinkage from moisture loss, damage and deterioration from exposure to the elements, or other damage to their hay—during the time the hay was stored on my farm." [Doc. 55-2] at 2–3.[6] Armstrong added that Douma "orally agreed to these terms when we met in my office." *Id.* at 3. This is a factual dispute that precludes summary judgment.

Despite this dispute, Plaintiffs argue that summary judgment is nonetheless proper because the standard for whether a contrary agreement exists calls for clear language, and nobody can recall the exact language used during negotiations. [Doc. 60] at 2. In support of this argument, they point to Armstrong's affidavit, which does not contain the exact language used by the parties when Plaintiffs allegedly agreed to assume the risk of loss. *Id.* The Court disagrees; a reasonable jury could rely on Armstrong's affidavit to find that the parties agreed to shift the risk of loss to Plaintiffs. Armstrong avers that when he discussed risk of loss with Douma, they discussed loss

---

[6] Though Armstrong does not expressly say so in his affidavit, both parties operate under the assumption that he avers that he shifted the risk of loss from delivery to when Plaintiffs paid for the hay. *See* [Doc. 60] at 7, 9; [Doc. 55] at 6.

from hay shrinkage, exposure to the elements, "or other damage" while the hay was stored on the farm. [Doc. 55-2] at 2–3. Armstrong also states that Douma expressly agreed that "the dairies would assume the risk of loss." *Id.* at 2. Such testimony could convince a reasonable jury that the parties "clearly" shifted the risk of loss upon payment.

Armstrong need not repeat in his affidavit the exact language allegedly employed to shift the risk of loss in order to create a genuine issue of material fact. None of the cases Plaintiffs rely upon, such as *Caudle*, are binding authority. The ultimate issue in any § 55-2-509(4) case is whether the parties intended to shift the risk of loss. *Caudle* used the "clear and unequivocal language" standard to determine whether "it was . . . the intention of the parties to transfer risk of loss of the trailer [p]rior to delivery." *Caudle*, 535 S.W.2d at 241. Similarly, *Hayward* adopted that standard to ensure the agreement "is sufficient to apprise the buyer that he bears the risk of loss on goods he has . . . not yet received." *Hayward*, 188 N.W.2d at 724. In this case, the parties dispute whether they intended, and actually agreed, to shift the risk of loss. There is nothing to prevent a jury from making that determination. Courts routinely deny summary judgment when the parties dispute the terms of an oral agreement. *See, e.g.*, *Med James, Inc. v. Ins. Mktg. Sols., Inc.*, Civ. Action No. 05-2209-KHV, 2006 WL 1360400, at *4 (D. Kan. 2006) ("Because the parties never signed a contract, the jury must resolve any disputes regarding the terms of the parties' oral agreement.").

Plaintiffs then argue that, since the "clear and unequivocal language" standard would be more difficult to apply to oral contracts, § 55-2-509 must contain an implicit requirement that the parties reduce any contrary agreement to writing. [Doc. 60] at 7. No such rule appears in any precedent. Comment 5 to § 55-2-509—which states that a court may infer a contrary agreement

7

from the surrounding circumstances—presumes that the UCC drafters did not contemplate this requirement. The mere fact that the parties in *Caudle* attempted to execute a written contrary agreement does not "set out an implicit requirement that such an agreement be written." *Id.* More to the point, the UCC defines an "agreement" as "the bargain of the parties in fact, as found in their language *or inferred from other circumstances*, including course of performance, course of dealing or usage of trade." § 55-1-201(b)(3) (emphasis added). Since the UCC permits courts to infer an agreement from the parties' course of dealing or trade usage, it follows that a contrary agreement need not be in writing. *See McKenzie v. Olmstead*, 587 N.W.2d 863, 866 (Minn. Ct. App. 1999); *Mercanti v. Persson*, 280 A.2d 137, 141 (Conn. 1971) (stating that, if the parties produced evidence of trade usage, it may create a contrary agreement).[7]

Though Armstrong's affidavit sufficiently creates a genuine issue of material fact on its own, Defendants' evidence of trade usage also prevents the Court from granting summary judgment. The UCC defines a "trade usage" as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." § 55-1-303(c). Defendants submit the

---

[7] Plaintiffs argue that *Mercanti* does not apply here because it "is a case of estoppel, not custom and usage." [Doc. 60] at 10. The Court disagrees; the case concerned *both* estoppel and usage. In *Mercanti*, the defendant, Persson, agreed to build a mast for the plaintiff's yacht. *Mercanti*, 280 A.2d at 138. The defendant claimed that he failed to deliver it because a fire destroyed the mast and the parties agreed that the plaintiff would bear the risk of loss. *Id.* Persson separately defended on the basis of estoppel because he failed to insure the mast only once Mercanti falsely told him that he—not Persson— would insure it. *Id.* The court found that trade usage did not create a contrary agreement under UCC § 2–509(4). "[I]f it was the custom or usage of the boat building trade for the boat owner to assume the responsibility for insuring work in progress against risk of loss by fire, the risk of loss would be on the plaintiff," but no evidence of trade usage existed. *Id.* at 141. The court only discussed estoppel *after* it held that insufficient evidence of trade usage existed to infer a contrary agreement. The court stated that "[e]stoppel is a valid defense to the present action *notwithstanding* [§ 2–509]" because the plaintiff misrepresented his insurance coverage. *Id.* at 142 (emphasis added). The court analyzed estoppel separately from § 2–509. *Mercanti* is therefore instructive because one of its central holdings concerned whether trade usage could establish a contrary agreement.

affidavit of Robert Carpenter, a farmer who has grown alfalfa hay near Dell City, Texas, for over 35 years. [Doc. 55-3] at 1. He states

> it was the custom and practice of producers and purchasers of Alfalfa hay in [the] region . . . that the risk of loss of the hay passed to the customer at the time the hay was placed and stacked in the producer's stack yards for storage . . . and that such practice existed for many years.

*Id.* In response to the Carpenter affidavit, Plaintiffs proffer the affidavit of Dr. Robert Lane. [Doc. 60-1] at 1–2. He states that the trade usage in the *general* hay industry is to shift the risk of loss only upon delivery of hay. *Id.*[8] This argument, however, misses the boat. A reasonable jury could rely on Carpenter's affidavit to find that hay farmers *specifically* around Dell City, Texas, customarily shift the risk of loss to the buyer upon payment. The UCC definition of trade usage—including a practice with "such regularity of observance in a *place*, vocation, *or* trade"—indicates that a specific trade usage in one place may govern, irrespective of the good's general market. § 55-1-303(c) (emphasis added). Even Dr. Lane concedes, "I cannot speak to [Carpenter's] perception that the custom and usage in his local trade is different for buyers and sellers of alfalfa hay in the immediate vicinity of Dell City, Texas." [Doc. 60-1] at 2. Though Douma avers that "there are [no] trade practices that are unique to 'Dell City, Texas,'" [Doc. 60-3] at 4, the Court

---

[8] Plaintiffs argue that "[i]f indeed there is some unique, localized convention particular to Dell City, Texas, it is at odds with the broader industry standards." [Doc. 60] at 6. They do not argue that Carpenter's affidavit is insufficient evidence of local trade usage. *See Mitsubishi Int'l Corp. v. Interstate Chem. Corp.*, No. 08 Civ. 194(JSR), 2008 WL 4387392, at *1–3 (S.D.N.Y. Sept. 24, 2008). Though Plaintiffs state that the "scope and basis for his opinion is not provided," [Doc. 60] at 6, he bases his affidavit on more than 35 years of experience in farming alfalfa hay. [Doc. 55-3] at 1. Plaintiffs offer no argument for why that basis is insufficient. Plaintiffs next object that the Court should deem Carpenter's affidavit inadmissible because Defendants never disclosed him, presumably relying on Federal Rule of Civil Procedure 37(c)(1). [Doc. 60] at 6; *see* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness . . . the party is not allowed to use that information or witness to supply evidence on a motion . . . ."). Rule 56(c)(2), however, precludes using evidence only when the "fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). Even if Defendants have not yet disclosed Carpenter, his affidavit *can* still be admissible if he is disclosed before the discovery deadline of February 12, 2019. *See* [Doc. 20] at 2 (Scheduling Order). Therefore, Plaintiffs' objections to Carpenter's affidavit are overruled and the Court will assume the affidavit offers sufficient evidence of trade usage.

cannot resolve Carpenter's and Douma's competing affidavits at the summary judgment stage without making a credibility determination, which the Court cannot do at this stage of the proceedings. *See Nat'l Aviation Underwriters, Inc. v. Altus Flying Serv., Inc.*, 555 F.2d 778, 784 (10th Cir. 1977) ("Affidavits are not a substitute for trial and summary judgment is improper where an issue turns on credibility . . . ."). A jury must resolve this dispute. The jury could credit Carpenter's affidavit to find that the regional trade usage created a contrary agreement under Comment 5 to § 55-2-509.[9]

This determination, however, does not end the inquiry. Plaintiffs argue that they did not pay for the hay destroyed by the fire until *after* the fire occurred. [Doc. 43] at 8. If true, then the risk of loss remained with Defendants when the fire struck even if an oral contrary agreement existed. Defendants contend that Plaintiffs paid for the destroyed hay before the fire occurred. [Doc. 55] at 6–7. Recall that Plaintiffs paid for the hay incrementally during the growing season as Defendants invoiced them for it. [Doc. 43-1] at 1–2; [Doc. 43-3] at 1. Each invoice was for hay located on a specific plot of land on the farm. *See* [Doc. 43-2]. The fire only destroyed hay on part of the farm; some plots of land were unaffected. [Doc. 43-1] at 7–8. It is thus entirely possible that Plaintiffs, in response to an invoice sent to them after the fire, paid for hay, and the invoice concerned hay on the part of the farm where the fire occurred. If that is the case, then Plaintiffs paid for the destroyed hay after the fire, and Defendants retained the risk of loss. It is also possible, however, that Plaintiffs, in response to an invoice sent to them before the fire occurred, paid for hay located on the part of the farm where the fire occurred. If that is the case,

---

[9] Defendants also argue that the parties' course of dealings indicates they reached a contrary agreement because when shrinkage reduced the hay Plaintiffs received, Plaintiffs nonetheless paid full price for it. [Doc. 55] at 7–8. Because the Court finds that a reasonable jury could rely on Armstrong's affidavit and local trade usage to find that such an agreement existed, it will not determine whether this course of dealing creates a genuine issue of material fact.

then Plaintiffs could have paid for the destroyed hay before the fire, and Plaintiffs assumed the risk of loss.

The problem for Plaintiffs is that the record does not establish when they paid for the hay that the fire destroyed. Such is the case because (1) no evidence exists on the record of what plot of land was affected by the fire and (2) no evidence exists listing the plot of land corresponding to the hay that Plaintiffs bought. The only evidence of when Plaintiffs paid for the hay is a list of invoices, portions of which are attached to this opinion as Exhibit 1. [Docs. 43-2 to 43-3]. The list of invoices, however, only summarizes the quantity of hay grown, its price, and the date of the invoice. *See id.* It does not mention where on the farm the fire occurred. Nor does it mention where the invoiced hay was located on the farm. Since the list does not state where the purchased hay was located on the farm, it does not allow the Court to compare the location of the fire with the location of the purchased hay. The Court therefore cannot be sure that Plaintiffs paid for the destroyed hay on a certain date. Simply put, the list of invoices does not resolve the material issue of when Plaintiffs paid for the hay that burned. At oral argument, Plaintiffs' counsel agreed: "I don't think anybody can pinpoint of those invoices, which ones were [for] the hay that burned." [Doc. 72] at 23 (Transcript). Therefore, even assuming the existence of a contrary agreement, the record fails to establish that Plaintiffs paid for the hay after it had already burned. Accordingly, the Court cannot grant summary judgment on Count II of the Complaint.

Finally, Plaintiffs argue that damage to the hay does not excuse nonperformance of the contract under § 55-2-613. [Doc. 43] at 9–11. Section 55-2-613 allows a buyer to either void a contract or "accept the goods with due allowance from the contract price for the deterioration or the deficiency in quantity" when the goods identified in the contract "suffer casualty without fault

of either party." § 55-2-613. This provision of the UCC applies, however, only if the goods are harmed or destroyed "before the risk of loss passes to the buyer." *Id.*; *see* § 55-2-613 cmt. 2. Since the parties dispute how they allocated the risk of loss, Plaintiffs cannot prove as a matter of law that § 55-2-613 allows them to recover for the deficiency in the quantity of hay delivered to them.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Partial Summary Judgment [Doc. 43] is **DENIED**.

**IT IS SO ORDERED.**

**STEPHAN M. VIDMAR**
**United States Magistrate Judge**
**Presiding by Consent**

# EXHIBIT 1

Armstrong Hay Invoices

| Bates # | Invoice # | Date | $ Amount | Quantity (Tons) |
|---|---|---|---|---|
| Dairy00001 | 6200 | 4/27/2017 | $ 149,355.98 | 995.72 |
| Dairy00006 | 6201 | 5/5/2017 | $ 43,728.75 | 291.53 |
| Diary00009 | 6202 | 5/12/2017 | $ 39,953.50 | 266.39 |
| Dairy00025 | 6203 | 5/19/2017 | $ 26,964.06 | 180.31 |
| Dairy00061 | 6204 | 5/25/2017 | $ 115,698.01 | 771.33 |
| Dairy00014 | 6205 | 6/2/2017 | $ 69,740.40 | 464.94 |
| Dairy00017 | 6206 | 6/9/2017 | $ 67,010.48 | 446.73 |
| Dairy00021 | 6207 | 6/16/2017 | $ 61,399.88 | 409.34 |
| Dairy00028 | 6208 | 6/23/2017 | $ 59,746.33 | 415.92 |
| Dairy00031 | 6209 | 6/30/2017 | $ 76,163.57 | 531.77 |
| Dairy00035 | 6210 | 7/7/2017 | $ 29,890.87 | 211.99 |
| Dairy00039 | 6211 | 7/14/2017 | $ 77,073.98 | 527.9 |
| Dairy00042 | 6212 | 7/21/2017 | $ 40,013.26 | 288.27 |
| Dairy00052 | 6213 | 8/11/2017 | $ 100,470.21 | 727.23 |
| Dairy00062 | 6215 | 8/28/2017 | $ 20,173.29 | 148.33 |
| Dairy00066 | 6216 | 9/1/2017 | $ 26,026.00 | 182 |
| Dairy00070 | 6217 | 9/8/2017 | $ 24,512.97 | 170.04 |
| Dairy00074 | 6218 | 9/15/2017 | $ 37,759.88 | 253.42 |
| Dairy00056 | 6214 | 9/18/2017 | $ 31,146.48 | 225.65 |
| Dairy00078 | 6219 | 9/22/2017 | $ 26,684.66 | 180.85 |
| Dairy00081 | 6220 | 9/29/2017 | $ 62,533.25 | 426.78 |
| Dairy00085 | 6221 | 10/6/2017 | $ 45,130.95 | 300.88 |
| Dairy00088 | 6222 | 10/13/2017 | $ 27,744.08 | 184.96 |
| Dairy00092 | 6223 | 10/20/2017 | $ 16,995.75 | 113.31 |
| Dairy00099 | 6224 | 11/3/2017 | $ 24,552.00 | 163.68 |
| Diary00103 | 6225 | 11/10/2017 | $ 24,138.00 | 160.92 |
| Diary00116 | 6226 | 12/8/2017 | $ 28,879.95 | 192.63 |
| **Total** | | | $ 1,353,486.54 | 9,232.82 |