# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PHILMAR DAIRY, LLC; ARCH
DIAMOND, LLC; MOONSTONE DAIRY, LLC;
and HENDRIKA DAIRY, LLC;

       Plaintiffs,

v.                                       **No. 18-cv-0530 SMV/KRS**

ARMSTRONG FARMS and
RANDY ARMSTRONG,

       Defendants,

and

RANDY ARMSTRONG,

       Counterclaimant,

v.

PHILMAR DAIRY, LLC; ARCH
DIAMOND, LLC; MOONSTONE DAIRY, LLC;
and HENDRIKA DAIRY, LLC;

       Counter-defendants.

## MEMORANDUM OPINION AND ORDER DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF ROBERT CARPENTER, GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF JOSEPH ROMIG, AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF DR. ELIZABETH AUSTIN

THIS MATTER is before the Court on Plaintiffs' three Motions to Exclude Expert Opinion

Testimony. [Docs. 118, 119, 120]. Plaintiffs filed their Motion to Exclude Expert Opinion

Testimony of Robert Carpenter [Doc. 118] on May 17, 2019. They filed their Motion to Exclude

Expert Opinion Testimony of Joseph Romig [Doc. 119] and their Motion to Exclude Expert Opinion Testimony of Dr. Elizabeth Austin [Doc. 120] on May 20, 2019. Defendants responded to each Motion on May 30, 2019. [Docs. 125–27]. Plaintiffs replied to each Response on June 12, 2019. [Docs. 131, 133, 134]. The Court held oral argument on the Motions on July 8, 2019. [Doc. 153] (clerk's minutes). The Court has considered the briefing, the relevant portions of the record, the relevant law, and the oral argument. Being otherwise fully advised in the premises, Plaintiffs' Motion to Exclude Robert Carpenter is DENIED WITHOUT PREJUDICE, Plaintiffs' Motion to Exclude Joseph Romig is GRANTED IN PART and DENIED IN PART, and Plaintiffs' Motion to Exclude Dr. Elizabeth Austin is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Plaintiffs—New Mexico dairies—orally contracted to purchase alfalfa hay from Defendant Armstrong Farms (located in Dell City, Texas) and its owner, Defendant Randy Armstrong. [Doc. 1-1] at 13; [Doc. 43] at 4; [Doc. 43-1] at 1–2. Defendants failed to deliver 2,647 tons of hay and failed to refund the money Plaintiffs paid for it. [Doc. 1-1] at 15–16. Defendants assert that their former farm manager, Alfred Vest, discovered that a lightning-caused fire had destroyed the hay. [Doc. 43-1] at 7–8. They maintain that Plaintiffs held the risk of loss for the hay when this fire occurred. [Doc. 55] at 4, 6–8. Plaintiffs contend that Defendants fabricated the existence of the fire to elude their contractual obligations. *See, e.g.*, [Doc. 1-1] at 4; [Doc. 43] at 1–2. Plaintiffs filed suit, claiming that by failing to deliver the hay or refund its price, Defendants were unjustly enriched, breached their oral contract with Plaintiffs, committed fraud, and violated the New Mexico Unfair Practices Act. [Doc. 1-1] at 17–18.

Plaintiffs moved for partial summary judgment, arguing that Defendants retained the risk of loss when the alleged fire destroyed the hay. [Doc. 43]. The Court denied Plaintiffs' Motion, finding that genuine issues of material fact existed over (1) whether the parties orally agreed to shift the risk of loss to Plaintiffs while Defendants stored the hay on their farm, and (2) whether the local custom in Dell City established that parties to hay contracts customarily shifted the risk of loss to the purchaser before delivery. [Doc. 73] at 6–10. The Court based its latter holding on the affidavit of Robert Carpenter, a former hay farmer who averred that hay farmers near Dell City customarily shift the risk of loss of hay to the purchaser before its delivery. *See* [Doc. 55-3] at 1.

Trial is scheduled to begin on August 26, 2019. [Doc. 70] at 1. Plaintiffs move in the instant Motions to exclude the testimony of three defense experts. First, they move under Federal Rule of Evidence 702 to prevent Robert Carpenter from testifying about the aforementioned Dell City custom. [Doc. 118]. Second, they move under Rules 702 and 403 to exclude the testimony of Dr. Elizabeth Austin, who will purportedly testify that, from August 22, 2017, through August 25, 2017, lightning struck within certain "confidence ellipses"[1] that on or near the site where Defendants stored the hay at issue and the surrounding area. [Doc. 120-1] at 12–13, 16. Finally, they move under Rule 702 to exclude the testimony of Dr. Joseph Romig, who will purportedly testify, among other things, that lightning in fact caused the alleged fire and destroyed the hay at issue. [Doc. 119].

## ANALYSIS

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides:

---

[1] A confidence ellipse "represent[s] with 99% certainty [that] the . . . lightning strike recorded . . . contacted the ground within the bounds of the ellipse." [Doc. 120-1] at 12.

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:

(a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)      the testimony is based on sufficient facts or data;

(c)      the testimony is the product of reliable principles and methods; and

(d)      the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Supreme Court clarified this standard in *Daubert v. Merrell Dow Pharm., Inc.*, holding that, for a court to admit expert testimony, the expert must propose to testify to scientific knowledge[2] and the expert's proposed testimony must reliably assist the trier of fact to understand or determine a fact in issue. 509 U.S. 579, 589–91 (1993). The proponent of the expert testimony bears the burden to establish by a preponderance of the evidence that the testimony is admissible. *Walker v. Spina*, 359 F. Supp. 3d 1054, 1068 (D.N.M. 2019). Based on the above standards, to admit any of their expert testimony, Defendants must establish by a preponderance of the evidence the following elements: (1) the expert is qualified, (2) she proposes to testify regarding scientific or specialized knowledge,[3] (3) her methodology is reliable, and (4) her testimony will assist the jury in determining a fact in issue.

An expert is qualified if she "possess[es] 'such skill, experience[,] or knowledge in that particular field as to make it appear that [her] opinion would rest on substantial foundation and would tend to aid the trier of fact in [its] search for truth.'" *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (quoting *Graham v. Wyeth Labs.*, 906 F.2d 1399, 1408 (10th Cir. 1990)). An expert may testify if the proposed testimony lies within the "reasonable confines

---

[2] The Supreme Court later widened this requirement to include non-scientific testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999).

[3] Plaintiffs do not contest this element of the *Daubert* test, and the Court finds that each expert proposes to testify about scientific or specialized knowledge.

of [her] subject area." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996)). If the expert stays within the reasonable confines of her subject area, then "a lack of specialization does not affect the admissibility of [her] opinion, but only its weight." *Id.* (alteration in original) (quoting *Compton*, 82 F.3d at 1520). Courts must liberally construe an expert's qualifications and resolve any doubts in favor of admissibility. *See Walker*, 359 F. Supp. 3d at 1068–69 (stating that an expert "should not be required to satisfy an overly narrow test of [her] own qualifications" (quoting *Gardner v. Gen. Motors Corp.*, 507 F.2d 525, 528 (10th Cir. 1974)); *Hartzler v. Wiley*, 277 F. Supp. 2d 1114, 1116 (D. Kan. 2003).

The Supreme Court in *Daubert* addressed the standard for determining the reliability of an expert's methodology. It "[did] not presume to set out a definitive checklist or test. But some general observations are appropriate." 509 U.S. at 593. It identified four factors that help a court determine the reliability of an expert's methodology: (1) whether the theory, technique, or methodology could be or has been tested; (2) whether peer review and/or publication has confirmed the theory; (3) the known or potential error rate of the theory; and (4) the level of support for the theory in the community. *Id.* at 593–94. "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one." *Id.* To that end, a court need not apply each *Daubert* factor if the court deems one or more of them irrelevant to the situation at hand, *Kumho*, 526 U.S. at 152–53, and other courts have analyzed additional factors not mentioned by the Supreme Court in *Daubert*, *see Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (analyzing whether experts established their opinions independent of the litigation).

## A. Robert Carpenter

As noted above, Robert Carpenter is a former alfalfa-hay farmer who worked near Dell City, Texas, for 35 years. [Doc. 118-2] at 1. He plans to testify that, because the dry climate in the area protects hay from moisture damage, hay farmers near Dell City customarily stored hay outdoors on their farms. *Id.* at 1–2. Because that practice could open the hay to other risks, however, Carpenter will testify that "it was the custom and practice of the farmers to require the [purchasers] to assume the risk of loss [for the hay] during the time the hay was stacked on the farmers' property." *Id.* at 2. "That agreement was sometimes put in writing, but not always." *Id.*; *see id.* ("That [risk-of-loss] term was typical of hay contracts, whether oral or written.").

Plaintiffs attack Carpenter's testimony in two ways. First, they argue that he lacks the qualifications necessary to opine about the local custom. [Doc. 118] at 11. They believe that he based his report not on the actions of other Dell City farmers but solely on his own experience. *Id.* According to Plaintiffs, therefore, he lacks qualifications to testify about the *custom* in Dell City. *Id.* Second, they argue that Carpenter's methodology—relying on his personal observations during his farming career—lacks reliability. *Id.* at 13. The Court rejects each argument, but will allow Plaintiffs to renew their Motion if Carpenter testifies at trial that he based his report solely on how he ran his business.

### 1. Carpenter is qualified to testify about the local custom of alfalfa-hay farmers near Dell City, Texas.

At this stage of the proceedings, the Court finds that Carpenter possesses sufficient qualifications to opine on the alleged custom near Dell City. Carpenter grew alfalfa hay near Dell City for over 35 years. [Doc. 118-2] at 1. He "was the largest producer of alfalfa hay in the Dell

Valley." *Id.* He "wrote quite a few" contracts. [Doc. 118-1] at 3. Carpenter "personally made many such agreements [shifting the risk of loss] with buyers of [his] alfalfa hay and regularly used written contracts to confirm such custom and practice." [Doc. 118-2] at 2. Given his extensive experience in farming alfalfa hay and drafting contracts, coupled with his status as the (formerly) largest producer of alfalfa hay in the area, his testimony about shifting the risk of loss falls within the reasonable confines of his subject area—namely, hay farming and contract negotiating in Dell City.

Plaintiffs nonetheless argue that because he largely bases his testimony on his *own* experiences using *written* contracts, Carpenter lacks the qualifications necessary to opine on the custom generally near Dell City, especially the custom regarding oral contracts like the contract here. [Doc. 118] at 2, 11–12. At this stage of the proceedings, the Court disagrees. It is true that generalized experience does not automatically qualify a person to testify about a specialized subject. *Cf. Ralston*, 275 F.3d at 970 ("[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue."). However, Carpenter does not purport to have knowledge simply about the hay industry or Dell City in general. His testimony establishes that he farmed the type of hay at issue—alfalfa hay—and that he routinely included provisions in his contracts about risk of loss. Plaintiffs remain free on cross-examination to attack Carpenter's qualifications on the grounds that his practice differed from Armstrong's. *See, e.g.*, [Doc. 118-1] at 2–5. Yet, as his testimony liberally falls within the reasonable confines—even if not the exact confines—of his subject area, these complaints go not to the admissibility of his testimony, but to its weight. *See Ralston*, 275 F.3d at 970.

Moreover, Plaintiffs oversell Carpenter's testimony. He did not testify that he had no idea how other farmers in the area shifted the risk of loss. On the contrary, he testified that, because farmers in the area stored hay outside, "it was common" for them to shift the risk of loss to the buyer upon storage of the hay. [Doc. 125-1] at 10. Again, to the extent there were inconsistencies in Carpenter's testimony, those alleged inconsistencies affect the weight of his testimony, not its admissibility.

> **2.** **By relying on his personal observations of the Dell City hay market, Carpenter utilized a reliable methodology to conclude that the local farmers customarily shifted the risk of loss before delivery of the hay.**

Carpenter's methodology—relying on his experiences as a hay farmer near Dell City—is sufficiently reliable to merit admission. "If a[n expert] witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to the 2000 amendments. Carpenter explained why, due to Dell City's dry climate, hay farmers could successfully store hay outside with little fear of moisture damage. [Doc. 118-2] at 1–2. But he was not willing to accept the risk of loss while the hay was stored. So his contracts included clauses shifting the risk of loss to the buyer upon storage to protect himself from risks while the hay was stored on his property. *Id.* It is for this reason that, based on his experience, other farmers "practice[d] the same" as he. [Doc. 118-1] at 5. His experience—including the regularity with which he included risk-of-loss clauses in his contracts, *id.* at 2, and his observation that other farmers followed the same practice—is evidence that the local custom was to shift the risk of loss to the buyer upon storage of the hay.

8

Plaintiffs' qualms about Carpenter's methodology mirror those about his qualifications. Namely, Plaintiffs argue that he relied solely on his own personal experiences when formulating his report, which they believe do not establish any "custom." [Doc. 118] at 13. Similarly, they argue his experiences are inapposite because they included, unlike the instant case, language shifting the risk of loss in a written contract. *Id.* Again, these concerns, at this time, do not make his testimony inadmissible. Carpenter testified that "[y]ou can have an agreement [to shift the risk of loss] that's not in writing." [Doc. 125-1] at 8. He testified that during his "long experience as a hay farmer near Dell City, [he] became very familiar with the *different* practices of hay farmers in the area." [Doc. 118-2] at 1 (emphasis added). When asked whether other farmers adhered to this practice, Carpenter replied that they "practice[d] the same" as him because, due to the protections from moisture offered by the dry climate, "it was beneficial to the dairymen" to store the hay outdoors. [Doc. 118-1] at 5. He explained that this practice proved beneficial to the dairymen because most of the farmers' customers "worked and lived in wetter climates where covered storage is necessary" to protect the hay from moisture damage. [Doc. 118-2] at 2. Therefore, it does not appear that Carpenter based his opinion solely on his practice; he relied, at least in part, on his general knowledge of the local industry.

Plaintiffs next argue that Carpenter's failure to identify any independent study of Dell City custom, or any other person corroborating his opinion, weighs against admissibility, [Doc. 118] at 13–14, but such arguments ignore *Daubert*'s flexible standard. Though peer review, independent testing, and community support for a theory often determine expert testimony's admissibility, the applicability of each *Daubert* factor changes depending on the exact testimony at issue. *Daubert*, 509 U.S. at 593–94. The Court is unsurprised that Carpenter has not produced

9

independent studies or peer reviewed articles about Dell City alfalfa-hay customs because such niche studies would have little applicability outside the instant litigation.[4]  Similarly, Plaintiffs' disappointment that Carpenter has never before testified as an expert about Dell City's local trade usage, [Doc. 118] at 2, matters little when litigation over such issues is presumably rare.  For the above reasons, Plaintiffs' attempts to undercut his methodology's reliability do not change the outcome.

Yet, the Court has misgivings about Carpenter's testimony.  Though he testified that other farmers in the area "practice[d] the same" as him, [Doc. 118-1] at 5, he arguably did not fully explain his basis for that observation.  For example, Carpenter identifies no contracts or conversations that indicate how he would know that other farmers shifted the risk of loss as he did. The Court understands why the dry climate may theoretically allow Dell City farmers to store crops outside, but both Carpenter's report and testimony lack detail on how he actually—not theoretically—knows that other farmers practiced the same as him.  Because Carpenter testified that other farmers practiced the same as him, his testimony survives this *Daubert* challenge. However, if at trial he bases his testimony solely on his own personal practices, the Court may revisit this ruling.

The Court therefore finds that at this stage of the proceedings, Carpenter's reliance on his own experience in and observations of the Dell City alfalfa-hay market represents a reliable methodology.  Nevertheless, the Court will allow Plaintiffs to *voir dire* Carpenter outside the

---

[4] Moreover, despite Plaintiffs' insistence to the contrary, Carpenter's methodology does not lack independent review. Plaintiffs had every opportunity to depose other Dell City hay farmers to determine whether Carpenter's experience matched the local practice.  They chose not to do so.  Instead, the only other local farmer who testified—Armstrong— also testified that Dell City farmers shifted the risk of loss to the buyer upon storage of hay.  [Doc. 125-2] at 2–3.

presence of the jury to ask him just how his personal experience translates to knowledge about the custom of other farmers in the Dell City area. If he testifies that he solely based his opinions on his own practices, Plaintiffs may renew the present Motion.

### 3. Carpenter's testimony would assist the jury.

Plaintiffs do not expressly contest whether Carpenter's testimony would assist the jury in determining a fact in issue, but some of their arguments suggest that they believe it would not. For example, Plaintiffs' counsel and Carpenter had the following exchange:

> Q: In this case, if the jury that's going to hear this case is not convinced that there ever was a fire, then do your risk of loss opinions kind of become a little moot at that point; in other words, if there was never a loss, does it matter what the practice is with respect to risk of loss?
> . . .
> A: You know, I don't think I've ever given an opinion or anything on risk of loss.

[Doc. 118-1] at 2–3. Plaintiffs latch onto Carpenter's answer as an "a-ha!" moment indicating that he "is not able to offer anything on the narrow and precise issue . . . of shifting the risk of loss." [Doc. 131] at 5. Two problems exist with this logic. First, Plaintiffs asked Carpenter for a legal conclusion, which an expert cannot give. *Specht v. Jensen*, 853 F.2d 805, 807–10 (10th Cir. 1988). Second, when Plaintiffs' counsel asked Carpenter to clarify his answer to this admittedly confusing hypothetical, he testified that his expert report addressed risk of loss based on his experience with his contracts. [Doc. 125-1] at 7.

Similarly, Plaintiffs highlight the following exchange:

> Q: All right. I'm talking about a scenario where [risk of loss is] never discussed, there's never an agreement, is it your opinion that there's some general expectation in your industry about what that point is where the risk of loss shifts from the grower to the buyer without ever discussing it?
> A: I'd probably still own the hay.

Q:      What do you mean?
A:      If I hadn't discussed it with anybody or shaken a hand or had a written agreement, I'd still own the hay.

[Doc. 118-1] at 4. Plaintiffs believe that this testimony indicates that the Dell City custom as applied to the instant case—where, according to Plaintiffs, the parties never discussed the risk of loss and never reduced their agreement to writing—would assign the risk of loss to Defendants. [Doc. 118] at 6–7.

However, Carpenter's testimony here amounts to a legal conclusion. Carpenter may testify that, factually, Dell City had a certain local custom. He may not testify, however, about the legal ramifications of either that custom or the absence of certain language in a contract. *See Specht*, 853 F.2d at 807–10. That he believes, absent an express loss-shifting agreement, he would own the the hay is a legal conclusion that has no bearing on the admissibility of his testimony that Dell City hay farmers had a local custom to shift the risk of loss to the buyer upon storage of the hay. Moreover, even if his testimony was not a legal conclusion, the Court would find that Plaintiffs' complaints about it go to its weight, not admissibility.

Carpenter's testimony therefore, at this time, meets each element of the test described by Rule 702 and *Daubert*. Plaintiffs' Motion to Exclude Expert Opinion Testimony of Robert Carpenter is denied without prejudice.

**B.      Dr. Elizabeth Austin**

Dr. Elizabeth Austin is a forensic meteorologist. She was retained by Defendants to opine on the likelihood that lightning struck on or near the disputed hay around the time Defendants maintain the fire began. [Doc. 120-1] at 3. She analyzed storm reports, temperature reports, radar data, weather forecasts, and other sources of information in making this determination. *See id.* at

5–29.  She found with "99% certainty" that lightning struck within certain confidence ellipses[5] near the hay—some strikes within two miles, others within one-half mile—on August 22, 2017, through August 25, 2017.  *Id.* at 12–17.  The two closest strikes occurred around 6:00 p.m. on August 22 and around 12:45 p.m. on August 24.  *Id.* at 12.  Dr. Austin reported that "any of these nearby strikes . . . are considered meteorologically close to the fire ignition point."  *Id.* at 13.

Plaintiffs argue that the Court should exclude Dr. Austin's testimony for two reasons: (1) under *Daubert*, it will not help the jury decide the case, and (2) under Federal Rule of Evidence 403, its probative value is outweighed by the likelihood that it will confuse the jury. [Doc. 120] at 7–11.  For the following reasons, the Court finds that Dr. Austin's opinion about lightning strikes occurring after the early morning of August 24 are not relevant and, therefore, barred under Federal Rule of Evidence 401 and *Daubert*.  The Court will admit Dr. Austin's testimony concerning lightning strikes between August 22 and the early morning of August 24.

The Court must first define the exact testimony at issue.  Dr. Austin testified that lightning struck within certain confidence ellipses near the hay between August 22 and August 25. [Doc. 120-1] at 30.  At other points of her report, however, she made statements that suggest she evaluated whether lightning actually caused the fire.  For example, she opined that lightning struck "under conditions conducive to fire," *id.* at 17, and that the lightning strike "on August 22 was more likely to have caused a fire in the subject location, given the proximity of the lightning on that date . . . and given the higher surface temperatures and the lower relative humidity prevailing on that date," *id.* at 23.  Dr. Austin did not expressly opine that lightning caused a fire, and

---

[5] A confidence ellipse is an area on a map—often shaped like a circle or oval—in which Dr. Austin opined, with 99% certainty, that lightning struck.  *See* [Doc. 120-1] at 16.

Defendants do not argue that she testified to such a conclusion.[6]  *See generally* [Doc. 126].  The Court will therefore not allow her to testify that lightning caused the fire.  She may, however, testify consistent with her report that lightning struck within certain confidence ellipses near the hay and that the weather conditions at the time were conducive to fire.  The issue is whether this proposed testimony would help the jury.

The Tenth Circuit has identified three "non-exclusive factors to determine whether the [expert's] testimony will assist the trier of fact: (1) whether the testimony is relevant; (2) whether it is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility."  *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006).  As to the first factor, evidence is relevant if (1) it has any tendency to make a fact more or less probable than it would be without the evidence, and (2) the fact is of consequence in determining the action.  Fed. R. Evid. 401.

Dr. Austin's testimony concerning lightning strikes between August 22 and the early morning of August 24 is relevant because (1) it tends to make the occurrence of lightning more probable than it would be without her testimony, and (2) whether a lightning-caused fire occurred lies at the heart of the parties' dispute.  She concluded in her report that "lightning most likely struck the subject area" on August 22 and August 25, [Doc. 120-1] at 30, around the time that Vest reported seeing the fire's aftermath.  Her review of meteorological data showed that eight lightning strikes occurred within two miles of the hay, and three occurred around one-half mile from the hay.  *Id.* at 12.  The data indicated with "99% certainty" that lightning struck within these areas—

---

[6] Additionally, at oral argument, defense counsel emphasized that Dr. Austin will not testify that lightning caused the alleged fire.  *See* Recording of Oral Argument, July 8, 2019, Liberty—Hondo Courtroom, at 1:59:00.

although Dr. Austin could not pinpoint the precise spot on the farm that lightning struck. *Id.* at 12–13. She identified the evening of August 22 as one of the most likely times that lightning struck. *Id.* at 30. Thus, her testimony about lightning on August 22 tends to establish that lightning occurred close to the time when the fire purportedly began.

Defendants provided the following response to an interrogatory requesting the date of the alleged fire: "Upon information and belief, the night of August 23rd or early morning of August 24th, 2017." [Doc. 120-2] at 3. Dr. Austin, however, found that lightning most likely struck nearest the hay at two different times: the afternoon of August 22 and the afternoon of August 24. [Doc. 120-1] at 30. Plaintiffs therefore argue that Dr. Austin's testimony is not relevant because whether lightning struck on August 22 or the afternoon of August 24 does not relate to whether a fire occurred at night on August 23 or early morning on August 24. *See* [Doc. 134] at 5. The Court agrees in part. At his deposition, Armstrong testified that his interrogatory answer was incorrect, and that the fire most likely occurred on the night of August 22. [Doc. 120-3] at 3. The Court will therefore permit Dr. Austin to testify concerning lightning strikes occurring on August 22, even though Defendants gave a different date in their interrogatory answers. That conflict is a matter for cross-examination at trial.

On the other hand, there is no testimony that the fire occurred at any time after the early morning of August 24. Therefore, Dr. Austin's finding that lightning occurred on the afternoon of August 24 is not relevant; Vest saw the *aftermath* of the fire, at the latest, on the morning of August 24. For that reason, Dr. Austin may testify concerning the lightning strikes she identified between August 22 and the early morning of August 24. However, she will not be allowed to testify concerning any lightning strikes that occurred after the early morning of August 24.

15

Whether lightning caused a fire that destroyed the hay is at the crux of this case. Even in the briefing on the instant Motion, Plaintiffs vehemently dispute whether a lightning-caused fire occurred at all. *See* [Doc. 120] at 3; [Doc. 134] at 4–5. Her testimony establishes the necessary predicate for Defendants' defense: that lightning struck near the hay. Dr. Austin's testimony relates to a fact of consequence in determining this action. Her testimony about lightning strikes occurring on or before the early morning of August 24 is therefore relevant.

Whether lightning struck within certain confidence ellipses near the hay at the time when Defendants claim the fire occurred is not a fact within the jury's common knowledge and experience. The second factor therefore weighs in favor of finding that Dr. Austin's testimony would help the jury. As Plaintiffs note, jurors likely know that lightning commonly strikes in West Texas in the summer. [Doc. 120] at 7. Yet, Dr. Austin's testimony goes beyond that. She testifies that lightning specifically struck at certain locations near the hay on certain dates. Such particularized knowledge of the location and time of lightning strikes does not lie within the common knowledge or experience of the jury.

Finally, the Court does not believe that Dr. Austin's testimony would usurp the jury's role of evaluating a witness's credibility. The final factor therefore weighs in favor of admitting Dr. Austin's testimony.

As all three factors weigh in favor of finding that Dr. Austin's testimony would assist the trier of fact, and Plaintiffs contest neither Dr. Austin's qualifications nor the reliability of her testimony, the Court rejects Plaintiffs' *Daubert* challenge to her testimony concerning lightning strikes between August 22 and the early morning of August 24.

Plaintiffs also argue that the Court should exclude Dr. Austin's testimony under Federal Rule of Evidence 403. The Court rejects that argument. Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "The district court has considerable discretion in performing the Rule 403 balancing test," but "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules 'is an extraordinary remedy and should be used sparingly.'" *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001) (quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999)).

The probative value of Dr. Austin's testimony is high. If the jury credits it, her testimony establishes that lightning struck within a half-mile of the hay at the time in question. Plaintiffs argue that allowing Defendants to "parad[e] a series of 'experts' to talk for . . . two days of trial time about the speculation that a fire may have occurred" would "result in a jury being confused into finding that there is actual evidence of such a fire, and . . . speculating that lightning may have caused such a fire." [Doc. 120] at 9. The Court disagrees because, as explained above, Dr. Austin will not be allowed to testify that lighting *caused* the fire, or even that a fire occurred. Moreover, the Court is not convinced that the so-called "inconsistencies," *id.*, in her report—such as that at one point she says lightning struck within a half-mile of the hay and at another point she says lighting struck "very close" to it, [Doc. 120-1] at 12—outweigh the testimony's high probative value. The Court will not exclude Dr. Austin's testimony under Rule 403.

Dr. Austin may therefore testify concerning the lightning strikes that she identified within her confidence ellipses as occurring between August 22 and the early morning of August 24. She

may not testify about lightning strikes that occurred after the early morning of August 24. Thus, Plaintiffs' Motion is granted in part and denied in part.

## C. Dr. Joseph Romig

Dr. Romig is a fire investigator. [Doc. 127-2] at 2. Defendants wish to call him as an expert witness to testify that a lightning-caused fire occurred at Armstrong Farms on August 22 and/or 23, 2017, and that this fire destroyed the hay "to such an extent that it would be considered a total loss."[7] [Doc. 127-1] at 7–8. Plaintiffs challenge both Dr. Romig's qualifications and his methodology's reliability. *See* [Doc. 119] at 4–17.

Dr. Romig spoke with Vest to obtain information about the storage of the disputed hay and the aftermath of the alleged fire. [Doc. 127-1] at 2–3. He then analyzed various factors— including the weight and size of each bale of hay, the configuration of the hay when Defendants stored it, the weather history, and possible ignition sources, *see id.* at 3–7—and found that the "likely ignition source was lightning," *id.* at 7. He reported that the fire originated "at or near the hay stacks." *Id.* He therefore concluded that "it is more likely than not that the burn would be substantial and result in a significant loss as described and testified to by Mr. Vest." *Id.* at 8.

### 1. Dr. Romig is qualified to testify about the hay fire at issue.

The Court finds that Dr. Romig is qualified to give expert testimony. Dr. Romig has investigated fires "for almost 40 years," having investigated "probably a thousand fires, explosions, [and] carbon monoxide incidents." [Doc. 127-3] at 3. He has "been involved in a

---

[7] Romig qualifies this statement by stating, "It would not be necessary to fully consume the entire extent of the subject haystacks to be considered a total loss." [Doc. 127-1] at 8.

18

number of wildland[8] fires that deal with origin and cause and spread." *Id.* He is a member of multiple fire investigation associations, such as the National Association of Fire Investigators, and is a certified fire-and-explosion investigator. [Doc. 127-2] at 3; [Doc. 127-3] at 2. Dr. Romig holds a PhD in astrogeophysics from the University of Colorado, a Master of Science in plasma physics from Oxford University, and a Bachelor of Arts in physics from the University of Colorado. [Doc. 127-2] at 1.

Plaintiffs nonetheless challenge his qualifications because he testified that he has only investigated around 10 wildland fires. [Doc. 119] at 4–5; *see* [Doc. 127-3] at 3. Plaintiffs also believe that Dr. Romig lacks the necessary qualifications because he has no experience investigating hay fires. [Doc. 119] at 4. The Court disagrees. Given Dr. Romig's vast experience in investigating fires—coupled with his additional experience in investigating wildland fires— testifying about the instant hay fire falls within the reasonable confines of his subject area. *See Ralston*, 275 F.3d at 970. Even if he has investigated more structure and vehicle fires than wildland fires, *see* [Doc. 127-3] at 3, that goes to the weight of his testimony rather than its admissibility, *see Ralston*, 275 F.3d at 970.

2. **Dr. Romig did not employ a reliable methodology because he failed to explain the methods and principles supporting his conclusions, and he did not properly justify his failure to follow fire investigation guidelines.**

The parties agree that the methodology described in National Fire Protection Association ("NFPA") 921 informs the instant dispute. *See, e.g.*, *id.* at 7; [Doc. 127] at 4. Courts readily accept NFPA 921 as a barometer for determining the reliability of methods used by fire investigation

---

[8] The alleged fire here is properly classified as a wildland fire because field crops fueled the fire. *See* National Fire Protection Association, *NFPA 921* § 28.2.3 (2017 ed.).

experts.  *See, e.g.*, *United States v. Aman*, 748 F. Supp. 2d 531, 535 (E.D. Va. 2010) ("The fact that NFPA 921 has been widely disseminated in the field of fire investigation is important because, as the Supreme Court has noted, 'submission to the scrutiny of the scientific community . . . increases the likelihood that substantive flaws in methodology will be detected.'" (quoting *Daubert*, 509 U.S. at 593)); *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 653 (D. Kan. 2003). Nevertheless, it "is not the only method of fire investigation," *Manuel v. MDOW Ins. Co.*, 791 F.3d 838, 845 (8th Cir. 2015), and an expert may properly fail to follow its guidelines if he justifies it, *Thompson v. State Farm Fire & Cas. Co.*, 548 F. Supp. 2d 588, 591–92 (W.D. Tenn. 2008); *Torske v. Bunn-O-Matic Corp.*, No. A4-03-21, 2004 WL 1717649, at *5 (D.N.D. 2004); National Fire Protection Association, *NFPA 921* § 1.3 (2017 ed.) [hereinafter "NFPA 921"].  A court does not abuse its discretion if it excludes the testimony of an expert who (1) purports, but fails, to follow NFPA guidelines, and (2) does not justify this failure.  *Manuel*, 791 F.3d at 845.

Plaintiffs object to myriad parts of Dr. Romig's methodology.  Specifically, they argue that his failure to observe and test materials from the scene of the fire makes his methodology unreliable.  [Doc. 119] at 8–11.  They also argue that his failure to properly define the alleged fire's area and point of origin renders his methodology unreliable.  *Id.* at 11.  Defendants argue that Dr. Romig followed NFPA 921 "by the book."  [Doc. 127] at 4.  Subject to two exceptions, the Court agrees with Plaintiffs that Dr. Romig did not engage in a reliable methodology.

With two exceptions, Dr. Romig bases his conclusions on an unreliable "methodology." He failed to explain the method he employed to arrive at most of his conclusions.  For example, Dr. Romig "concluded" that the fire began on August 22 or 23, 2017, and originated at the disputed haystacks, [Doc. 127-1] at 7, but nowhere in his report does he explain how he arrived at this

"conclusion." He simply parroted Vest's factual testimony about the fire without examining the accuracy of Vest's statements, a textbook violation of NFPA 921 and the scientific method. *See* NFPA 921 § 14.1.2.1 ("[A]ny information solicited or received by the fire investigator during a fire investigation is only as reliable as the source of that information. As such, it is essential that the fire investigator evaluate the accuracy of the information's source. Certainly, no information should be considered to be accurate or reliable without such an evaluation of the source."). Likewise, he did not explain the methodology behind his conclusion that he would expect the hay to ignite if lightning struck near it or his conclusion that the disputed haystacks "would be subject to multiple points of ignition due to the wind and traveling embers." *Id.* at 7–8. To be sure, Dr. Romig identified the weight, size, and stacking configuration of the hay at issue. *Id.* at 3–4. He also noted the temperature and weather history provided by Dr. Austin. *Id.* at 4. However, he did not explain how he applied these conditions to the instant case to arrive at his conclusions.

Similarly, Dr. Romig offered no scientific basis for his conclusion that lightning was the most likely cause of the fire. He used the process of elimination to whittle the possible causes of the fire down to lightning. *Id.* at 4–7. The Tenth Circuit has held that a district court does not abuse its discretion when admitting expert testimony relying on the process of elimination to ascertain the cause of a fire. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1237–38 (10th Cir. 2005). Yet, Dr. Romig applied no scientific methodology when engaging in the process of elimination. For example, he stated that no evidence supported a conclusion that arson or farmhand error caused the fire, [Doc. 127-1] at 5, but because he never visited the scene, he could not know whether evidence of arson or farmhand error existed. He simply parroted what Vest told him about the fire scene, *see id.*, which is not reliable expert testimony. When discussing lightning as the possible

cause, Dr. Romig merely opined that lightning "is recognized as a competent ignition source for hay," *id.* at 6, and that certain methods of stacking hay could "affect[] the burning rate of hay bales," *id.* at 7. He engaged in no scientific methodology explaining how lightning, in this instance, actually caused a fire; his analysis at best indicates that lightning *could* cause a fire and, if a fire occurred, the method of stacking hay *could* have increased the fire's growth rate.

Dr. Romig's analysis plainly suggests that he began with the conclusion that a lightning-caused fire destroyed the hay in one evening, then developed a "hypothesis" to fit that conclusion. Yet, "[c]oming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method." *Walker*, 359 F. Supp. 3d at 1072 (quoting *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502–03 (9th Cir. 1994)). The analytical gap between Dr. Romig's "methodology" and his conclusions is simply too great to justify admittance under Rule 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Dr. Romig's failure to follow a scientific or technical methodology becomes more apparent upon analyzing his failure to follow NFPA 921, specifically, his failure to visit the scene to observe and test the area. Dr. Romig testified that he did not think any discernable remnants of the fire remained at the farm because "Vest said the farm kind of cleans up itself."[9] [Doc. 127-3] at 6. He therefore did not visit the scene. *See id.* But Dr. Romig could not rely on the word of a lay person—without any experience on the record of fire investigation—to testify that no evidence of the fire remained. Dr. Romig relied on this faulty logic to justify his failure to visit the scene of the fire for testing and observation, as required by NFPA 921. *See* NFPA 921 §§ 4.3.2–.3, 4.4.3.1.

---

[9] Vest apparently based this statement on the arid and windy nature of the region. *See* [Doc. 127-3] at 6.

Simply accepting Vest's statements as true does not represent a scientific methodology and does not excuse him from observing the scene of the fire.

Similarly, Dr. Romig's failure to identify the fire's area and point of origin renders his methodology unreliable. "The origin of a fire is one of the most important hypotheses that an investigator develops and tests during an investigation." NFPA 921 § 18.1. A fire has multiple classifications of its origin. "The *area of origin* is defined as a . . . location *within* a fire scene, in which the 'point of origin' of a fire or explosion is reasonably believed to be located." *Id.* (second emphasis added). "The *point of origin* is defined as the exact physical location within the area of origin where a heat source and the fuel interact, resulting in a fire or explosion." *Id.* Though an investigator may not always be able to determine the exact point of origin, the investigator in such a circumstance should nonetheless "provide plausible explanations for the area of origin with the supporting evidence for each option." *Id.* § 18.2.1.3. The fire's origin is distinguished from its cause; the origin represents the location where the fire began, whereas the cause represents the circumstance that resulted in the fire. *See id.* § 19.1. "Generally, a fire[-]cause determination can be considered reliable only if the origin has been correctly determined." *Id.*

Here, Dr. Romig identified the origin of the alleged fire as: "at or near the hay stacks located outside the perimeter of the northeast sector of the crop circle identified as Circle #1. Specifically, the hay stacks were located between the crop circle and a large cattle feed-lot on the northeast sector of said crop circle." [Doc. 127-1] at 8. Plaintiffs do not believe that this statement sufficiently defines the fire's origin, arguing that "Romig does not even know the 'area of origin' of the fire, other than where the haystack was, based on the statements of Vest, thus omitting a key determination of fire investigation as set forth in [NFPA] 921." [Doc. 119] at 11.

The Court agrees. Dr. Romig merely identified the *scene* of the fire (the hay stacks). Yet, the scene of the fire is different than the fire's *area of origin*. As noted above, the area of origin is the location *within* the fire scene where the fire began. NFPA 921 § 18.1. NFPA 921 defines the scene of the fire, in turn, as "[t]he general physical location of a fire or explosion incident." *Id.* § 3.3.159. Dr. Romig's statement is the equivalent of stating that a fire that destroyed a house had an area of origin of "the house." Dr. Romig did not properly identify the fire's area of origin.[10]

He also candidly admitted that he "did not identify [the] *point* of origin other than a lightning strike that ignited the hay." [Doc. 119-1] at 17 (emphasis added). Of course, Dr. Romig failed to identify where the lightning struck—the purpose of the point-of-origin analysis. As noted above, Dr. Austin will testify that lightning struck within a half-mile of the hay stacks. *See* [Doc. 120-1] at 12. Yet, Dr. Romig failed to explain how that finding translated to a point of origin *on the hay itself*. Simply referring to Dr. Austin's report or other weather reports does not sufficiently identify the fire's point of origin. Defendants fail to explain why the half-mile radius is not an overbroad definition of the point of origin.

In fact, Defendants simply do not respond to Plaintiffs' concerns about the area and point of origin. These concerns facially merit exclusion of most of Dr. Romig's testimony. Wildland fires have unique spread patterns that inform both the origin and cause of the fire. "The purpose of the fire spread analysis is to determine whether the resulting physical damage and available data are consistent with the area of origin hypothesis." NFPA 921 § 18.2.1.1. Exposure to the elements

---

[10] Though NFPA 921 recognizes that sometimes the area of origin could encompass most or all of the scene, NFPA 921 § 18.8, Defendants make no effort to explain why this situation falls under such an exception. Dr. Romig should have, pursuant to NFPA 921, "identif[ied] the data that justif[ied] the conclusion that the area of fire origin cannot be reduced to a practical size." *Id.* Dr. Romig did not do so. Additionally, in such a circumstance, NFPA 921 directs the investigator to label the origin as "insufficiently defined," which Dr. Romig failed to do. *Id.*

significantly affects the spread of a wildland fire from its point of origin. "Considering the factors of wind, topography, and fuels, the origin is normally located close to the heel or rear of the fire." *Id.* § 28.7. "The direction the local wind is blowing while the fire is burning primarily determines the route of the head's advance." *Id.* § 28.5.1. Dr. Romig himself emphasized the role of the wind as the primary reason the fire caused a total loss of the disputed hay. *See, e.g.*, [Doc. 119-1] at 16 ("I'm calculating what the amount of hay, if it is subjected to lightning strike and stacked the way I thought or understood, would it burn to the extent Vest described. And my conclusion was yeah, probably more likely than not given the winds.").

Here, Dr. Romig's failure to identify the area and point of origin of the fire prevents a reliable analysis of how a fire that started on part of the hay caused a total loss of it. Defendants stored the hay in a rectangular pattern 1,400 feet long and 40 feet wide. [Doc. 127-1] at 3–4. On the evening of August 22, 2017, and morning of August 23, 2017—the only times for which Dr. Romig analyzed weather reports—the wind varied, sometimes blowing eastward and other times blowing northward. *Id.* at 4. Yet, without knowing the fire's area or point of origin, it is not apparent to the Court how Dr. Romig could reliably conclude that the fire caused a total loss of 2,647 tons of hay. If, for example, the area of origin occurred on the northern end of the rectangle, the northward wind would blow the embers north and ignite hay north of the area of origin—but these circumstances would not explain how the fire would destroy thousands of tons of hay south of the area of origin. The resulting physical damage of the alleged fire is not consistent with Dr. Romig's overbroad area of origin. He could not reliably test his hypothesis that the fire destroyed caused a total loss of 2,647 tons of hay without specifying the area and point of origin within the rectangular storage area.

Crucially, Defendants do not even mention the area or point of origin in their Response. *See generally* [Doc. 127]. They have the burden to demonstrate that Dr. Romig's testimony is admissible, and they provide no justification for Dr. Romig's failure to follow NPFA 921's guidelines. The Court will not comb through Dr. Romig's report and testimony to attempt to find a plausible reason why Dr. Romig justifiably failed to complete what NFPA 921 refers to as "one of the most important [analyses] that an investigator" does.[11] NFPA 921 § 18.1. Rather, the Court is limited to the arguments presented in Defendants' Response. The Court is not an expert on fire spread or investigation; Dr. Romig may disagree with the above analysis regarding the wind's facially vital role in causing the fire to spread. Yet, when presented with *no evidence* rebutting Plaintiffs' facially valid argument that Dr. Romig's failure to identify the area and point of origin makes his methodology unreliable, the Court will not assume the role of advocate and craft arguments to save Defendants' expert.

Dr. Romig failed to engage in scientific methodology, failed to properly follow NFPA 921 guidelines, and failed to justify his deviation from them. Defendants' proffered reason why his methodology is reliable—that he followed NPFA 921—has no merit. The Court consequently grants in part Plaintiffs' Motion to Exclude his expert-opinion testimony, subject to two exceptions.

In spite of the above deficiencies in Dr. Romig's methodology, the Court will allow him to testify on two narrow subjects: (1) conclusion 10 in his report, and (2) (with some caveats and

---

[11] Though Defendants argue that Dr. Romig spoke with Vest about the fire, *see* [Doc. 127] at 5, Vest did not witness the ignition of the fire and told Dr. Romig that he only arrived at the scene after the fire had reduced the hay to smoldering embers, [Doc. 127-1] at 3. Vest's recounting of events would shed no light on where the fire originated.

modifications) conclusion 11 in his report.  *See* [Doc. 127-1] at 8.  First, in conclusion 10, he opined, "The configuration of the haystacks (vertical stacking . . . and close proximity) was such that it would lend to more vigorous burning and a rapid fire spread."  *Id.*  He based this conclusion on a review of literature detailing how "various stacking methods . . . affected the burning rate of hay bales."  *Id.* at 7.  The review of relevant literature can be a reliable methodology.  *See Hartmann v. Uponor, Inc.*, Case No. 08-CV-1223-F, 2013 WL 12315163, at *4 (D. Nev. Nov. 25, 2013) (collecting cases). The literature here—including Webb's article detailing how methods of stacking hay affect the rate of fire spread, *see* [Doc. 127-1] at 7—readily bears a connection to the issue at hand (namely, the rate of the fire's spread).  Dr. Romig need not visit the scene or ascertain the area and point of origin in order to determine that a certain method of stacking hay bales generally causes fires to spread more quickly.  He may therefore testify that, if a fire occurred, the method in which Defendants stacked the hay would tend to increase the fire's growth rate.

Second, in conclusion 11, Dr. Romig stated, "It would be expected that a fire resulting from a lightning strike would consume the hay to such an extent that it would be considered a total loss." [Doc. 127-1] at 8.  He based this conclusion on a series of handwritten mathematical equations and notes, finding, "In the circumstances of this incident I would expect the fire spread to be significant and the attendant loss to be substantial."  [Doc. 153-1] at 6; *see id.* at 1–5.[12]  These equations involved variables including the arrangement of the hay stacks, the location of the initial lightning strike, wind speed, flame temperature, and flame thickness.  *Id.* at 1–5.

---

[12] Defendants did not attach these handwritten equations and notes to their Response.  Rather, they brought them to the Court's attention, for the first time, *after* it gave its tentative ruling at the oral argument.  *See* [Doc. 153] at 4. Though the Court could disregard this material because Defendants never attached it to their Response, in the interests of justice the Court will consider it.

Yet, Dr. Romig did not actually make a finding, in these notes, that the alleged lightning-cased fire in this instance *in fact* caused a total loss of the hay. His methodology simply focused on whether, as a *general* matter, the configuration of the hay stacks, coupled with the likely temperature of the fire and other variables, *could have* caused a total loss of the hay to the extent that Vest described. *See id.* at 1–6. Dr. Romig did not fully apply these equations to the facts of this case because, at every turn, he emphasized that whether the fire could consume the hay to the extent that Vest described "will depend on . . . the location of the initial stroke [of lightning] and the distribution of flaming debris blasted out by that stroke, the location of subsequent strokes [of lightning] and the attendant distribution of flaming debris, and the air flow." *Id.* at 6; *see id.* at 2 ("The formula *can be applied* to the initial point of ignition or to subsequent points where fire-brands land." (emphasis added)). In other words, in order to apply his analysis to the facts of this case, one would have to know the fire's area or point of origin—an analysis he failed to properly complete. Therefore, for the reasons explained above, Dr. Romig cannot reliably testify that the lightning-caused fire, if it occurred, "*would* consume the hay to such an extent that it would be considered a total loss." [Doc. 127-1] at 8 (emphasis added). Such testimony would require a proper area-and-point-of-origin analysis. Rather, he may testify only that a lightning strike, if it occurred, *could have* consumed the hay to such an extent that it would be considered a total loss.

To summarize, Dr. Romig may testify regarding conclusion 10 in his report. He may not testify to conclusion 11, as written in his report, because the conclusion analyzes whether the fire in fact or "would" have consumed the hay to such an extent that it would be considered a total loss. Dr. Romig may, however, testify to a subject closely related to conclusion 11: that,

theoretically, a lightning-caused fire could have (depending on the circumstances) consumed the hay to such an extent that it would be considered a total loss. In doing so, he may testify about the handwritten calculations described in [Doc. 153-1]. He cannot testify to any other conclusion offered in his report, including his conclusion that lightning caused the alleged fire and that the fire originated at or near the hay stacks at issue. For these reasons, the Court will grant Plaintiffs' Motion in part and deny it in part.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Exclude Expert Opinion Testimony of Robert Carpenter [Doc. 118] is DENIED WITHOUT PREJUDICE, Plaintiffs' Motion to Exclude Expert Opinion Testimony of Joseph Romig [Doc. 119] is GRANTED IN PART and DENIED IN PART, and Plaintiffs' Motion to Exclude Expert Opinion Testimony of Dr. Elizabeth Austin is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**
**Presiding by Consent**